Angelita P. **Mendiola**,
Plaintiff/Appellee,
**v.**
**Marianas Agupa Enterprises, Inc.**,
Mark Pinsker, Haruo Namihira
and Tomoya "Tom" Okuyama,
Defendants/Appellants.
Appeal No. 96-044
Civil Action No. 93-0775
August 31, 1998

Argued and Submitted April 15, 1998

Counsel for appellants: David A. Wiseman, Saipan.

Counsel for appellee: William M. Fitzgerald, Saipan.

BEFORE: TAYLOR, Chief Justice, DEMAPAN,

Associate Justice, and LIZAMA, Justice Pro Tem.[1]

TAYLOR, Chief Justice:

¶1 ▆ Appellants/defendants,[2] Marianas Agupa Enterprises, Inc. ("MAE"), Haruo Namihira ("Namihira"), and Tomoya Okuyama ("Okuyama"), appeal the August 8, 1996 Superior Court jury trial verdict[3] awarding appellee/plaintiff, Angelita P. Mendiola ("Angie"), $1,500,000 in combined damages against appellants. We have jurisdiction pursuant to Article IV, § 2 of the Commonwealth Constitution. N.M.I. Const., art IV, § 2 (1997).[4] We affirm.

## ISSUES PRESENTED AND STANDARDS OF REVIEW

¶2 ▆ Appellants present five issues for our review:

I. Whether the trial court erred in denying appellants' motion in limine to exclude all evidence that appellants gave Angie the 1989 Lincoln Town car as a gift because delivery had not been completed and therefore, no gift of the car had been effectuated. The issue of whether there has been a delivery of a gift is a mixed question of law and fact reviewed de novo. *Cabrera v. Cabrera*, 3 N.M.I. 1, 4 (1992). Admissibility of evidence is reviewed for an abuse of discretion. *Commonwealth v. Kaipat*, 2 N.M.I. 322, 327 (1991).

¶3 II. Whether the trial court erred in denying appellants' motions for summary judgment, directed verdict and for judgment notwithstanding the verdict ("JNOV") because an independent contractor, and not appellants' agent, committed the tortious acts of intentional infliction of emotional distress ("IIED"), thus

---

[1] Associate Justice Miguel S. Demapan was sitting as "Justice Pro Tem" and Associate Judge Juan T. Lizama was sitting as "Special Judge" when this appeal was argued and submitted.

[2] Defendant Mark Pinsker is not a party to this appeal.

[3] Appellants also appeal the following: (1) order denying motion for directed verdict dated August 30, 1995; (2) jury verdict dated August 31, 1995; (3) judgment dated September 8, 1995; (4) order denying motion for judgment notwithstanding the verdict dated February 27, 1996; (5) order denying motion for summary judgment dated August 2, 1996; (6) order denying motion for directed verdict dated August 9, 1996; (7) jury verdict dated August 8, 1996; and (8) order denying motion for judgment notwithstanding the verdict and new trial dated September 9, 1996.

[4] As amended by the passage of Legislative Initiative 10-3, ratified by the voters on November 1, 1997. and certified by the Board of Elections on December 13, 1997.

insulating appellants from vicarious liability. Because these issues are raised with respect to a motion for summary judgment, they are reviewed de novo. *Castro v. Hotel Nikko Saipan, Inc.,* 4 N.M.I. 269, 271 (1995).

¶4 III. Whether the trial court erred in denying appellants' motion for a directed verdict and in denying appellants' proposed jury instructions on the grounds that Angie failed to introduce sufficient evidence for a prima facie case of IIED. Because appellants' allege the trial court erred in refusing to give jury instructions, we review the instructions given as a whole under an abuse of discretion standard "to determine if they are misleading or inadequate." *Santos v. Nansay Micronesia, Inc.,* 4 N.M.I. 155, 160 (1994) (internal citations omitted).

¶5 IV. Whether the trial court erred in denying appellants' motion for JNOV on the grounds that Mark Pinsker was not appellants' authorized agent or, in the alternative, acted outside the scope of the agency relationship. We review a denial of a JNOV de novo. *Id.*.

¶6 V. Whether the trial court erred in denying appellants' motion to strike the punitive damages award. The punitive damages award is a finding of fact and will not be set aside on appeal unless it is clearly erroneous. *Ito v. Macro Energy, Inc.,* 4 N.M.I. 46, 54 (1993).

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 Angie is the wife of Diego Mendiola ("Diego"), a prominent businessman from a prominent family of Rota. MAE is a CNMI corporation engaged in the development of a resort on Rota. Namihira and Okuyama are corporate officers of MAE. Diego became involved with the appellants as a "consultant" assisting them to acquire land for the resort on Rota.

¶8 In early 1990, Diego and Angie traveled to Japan and met with the appellants. Namihira offered one of MAE's Lincoln Town cars (the "car") to Diego and when Diego refused, Namihira insisted that he would give it to his wife Angie as a gift.[5] Angie received possession of the car shortly thereafter.

¶9 Approximately five months after the car had been delivered to Angie, Frank Dela Cruz ("Cruz"), a MAE employee, contacted her at Okuyama's suggestion to inform her that the car insurance had expired and asked her to pay for the insurance renewal. Angie refused and testified that she told Cruz she would not pay for the insurance unless she received title to the car. Thereafter, appellants never asked for the return of the car until the incident which gave rise to Angie's IIED claim on July 1, 1991 (the "incident").

¶10 At some time prior to July 1, 1991, MAE had retained the law firm of White, Pierce, Mailman and Nutting ("the White Law Firm") to provide them general representation on a number of legal issues and problems, including the possible "repossession" of the car. The lawyers were told that the car had been missing for over a year, and had not been informed of any voluntary transfer of the car to Angie.

¶11 On July 1, 1991, Mitch Lewis ("Lewis"), a MAE employee, and Mark Pinsker("Pinsker"), a White Law Firm attorney, went to Angie's work and demanded that the car be returned. When Angie refused to give Pinsker the keys to the car, he became hostile, called the police and a shouting match between the two ensued in the parking lot of her workplace. Angie called her attorney, Pedro M. Atalig ("Atalig"), who was present while Pinsker told the officer to arrest Angie for unlawful possession.[6]

¶12 Angie suffered severe emotional distress and brought a claim against Pinsker, as an agent of MAE, and the appellants. Her case was submitted to a jury trial that awarded her $500,000 in damages as against Pinsker solely, and $1,500,000 in combined damages against appellants.[7] The trial court judge found the amount of damages to be excessive and offered a remittitur[8] which Angie subsequently rejected. The case was brought before a second jury trial on August 5-8, 1996. The second jury rendered a verdict for Angie for the same amount as the first jury trial, $1,500,000 in combined damages ($500,000 as general damages, $1,000,000 as punitive damages).[9] Appellants timely appealed.

## ANALYSIS

*I. Did the Superior Court err in allowing evidence that*

---

[5] There was conflicting testimony as to whether the car was intended to be a "gift" or a loan to Angie. Both Namihira and Okuyama reside in Japan and were not subpoenaed to testify before the jury. Both however appeared for depositions. Their depositions were read to the jury and into the record as testimony. Namihira in his deposition stated that Diego asked for the car and he said the car was only "lent" to Diego and not to Angie. TR 265-266; ER8-9; TR 273-274; ER 10-11. Okuyama testified that he was told to deliver the car to Angie, TR 278, ER 12, but that Namihira never told Okuyama the car was intended as a gift. Namihira told Okuyama he was "allowing" Diego to use the car. TR 300-02; ER 14-16.

[6] The details of the confrontation are spelled out more specifically through Angie's testimony before the jury.

[7] *Mendiola v. Marianas Agupa Enterprises,* Civil Action No. 93-0775 (N.M.I. Super. Ct. Sept. 8, 1995) (Judgment at 1).

[8] *Mendiola v. Marianas Agupa Enterprises,* Civil Action No. 93-0775 (N.M.I. Super. Ct. Feb. 27, 1996) (Order Reducing Jury Award for Damage at 1-2).

[9] *Mendiola v. Marianas Agupa Enterprises,* Civil Action No. 93-0775 (N.M.I. Super. Ct. Aug. 8, 1996) (Jury Verdict at 1).

*Angie received the car as a "gift"?*

¶13 ■ To establish that a "gift" has been made, the moving party has the burden of proving three separate elements: (1) donative intent; (2) delivery; and (3) acceptance. *Cabrera*, 3 N.M.I. at 5. Appellants cite 9 CMC § 2103(c) for the proposition that delivery was not effectuated until a new registration card had been issued in Angie's name. Section 2103(c) states that ". . . until the Chief has issued the new registration card, *delivery of the vehicle shall be deemed not to have been made,* title to it shall be deemed not to have passed, and the intended transfer shall be deemed not to be valid or effective for purpose" (emphasis added). Since Angie never received title to the car in her name, appellants argue it was error for the Superior Court to allow any evidence of a "gift" of the car to Angie to be presented to the jury as delivery had not been lawfully effectuated.

¶14 ■ Appellants' argument regarding vehicle registration and ownership is completely irrelevant because ownership was never an issue in the case. In fact, according to Angie's testimony, she conceded that legal title had not passed to her, but that Namihira had given the car as a gift, and that all he had to do was ask if he wanted it returned. At a minimum, Angie has established that she had permissive use of the car and any lengthy discussion of the Commonwealth statutory scheme regulating vehicles, transferring ownership and constructions of statutes is completely irrelevant. Further, Angie does not now, nor did she ever, claim ownership to the car or that the gift was valid under a legal definition.

*II. Did the Superior Court err in holding appellants vicariously liable for Pinsker's actions?*

¶15 Appellants argue that since Pinsker was at all times an employee of the White Law Firm, an attorney, and not an MAE employee, appellants could not have been held vicariously liable for the intentional torts of an independent contractor.

¶16 ■ This Court has previously enumerated ten factors in determining whether one is a servant or an independent contractor:

(1) The extent of control which, by the agreement, the master may exercise over the details of the work;
(2) Whether or not the one employed is engaged in a distinct occupation or business;
(3) The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(4) The skill required in the particular occupation;
(5) Whether the employer of the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(6) The length of time for which the person is employed;
(7) The method of payment, whether by the time or by the job;
(8) Whether or not the work is a part of the regular business of the employer;
(9) Whether or not the parties believe they are creating the relations of master and servant; and
(10) Whether the principal is or is not a business.

*Castro*, 4 N.M.I. at 273. These factors are to all be examined and not one factor is dispositive. *Id.* Generally, the trier of fact determines whether there is a sufficient group of favorable factors to establish the relationship. *Id.* However, it is for the court to decide whether the inference is clear or not that a master/servant relationship exists. *Id.*

¶17 We find that Pinsker operated as MAE's agent, and that MAE actively and intentionally participated in the actions which caused Angie's emotional distress. MAE's employee Lewis was present at all times while Pinsker was demanding the return of the car from Angie. Lewis never told Pinsker, the White Law Firm, or the police officer that Angie had received the car as a gift. By informing the lawyers of the White Law Firm that he had suddenly located the car after it had been missing for a year, along with the failure to tell them that the MAE's president intended to give Angie the car as a gift, Lewis falsely led Pinsker and the White Law Firm to the conclusion that Angie had in fact stolen the car. Thus, Pinsker became MAE's agent when he was called upon to "repossess" the car at Angie's place of work. Accordingly, appellants were properly found liable for the intentional tortious conduct of its agent.[10]

*III. Did Angie provide sufficient evidence for a prima facie claim of IIED?*

¶18 ■ According to § 46 of the RESTATEMENT OF TORTS, entitled "Outrageous Conduct Causing Severe Emotional Distress":

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily

---

[10] *See* § 212 of the RESTATEMENT OF AGENCY which establishes liability for a principal, regardless of the status of the agent, if the agent acts pursuant to the principal's discretion. *See also* §§ 252, 253 of the RESTATEMENT OF AGENCY, for the proposition that principals can be held liable for the torts of their attorneys.

harm.

RESTATEMENT (SECOND) OF TORTS §46 (1965).

¶19 Appellants present two arguments as to why Angie failed to provide sufficient evident for a prima facie claim for IIED: (1) it was error for the Superior Court judge to refuse to instruct the jury that the statements Pinsker made to the police were privileged; and (2) Angie did not suffer sufficient harm to support her IIED claim.

¶20 We find that "privilege" or lack thereof is not an element for IIED. In addition, MAE's actions were outrageous such that a jury found their actions twice to be beyond the normal bounds of decency, and therefore, a prima facie case of IIED was established pursuant to the RESTATEMENT OF TORTS. The jury heard testimony from Dr. Hocog confirming that Angie suffered from a medical illness, acute anxiety, and not just "nerves or an imaginary condition." (TR 245:23-246:9)

*IV. Did the Superior Court err in denying appellants' motion for JNOV on the grounds that Pinsker was not MAE's agent or, in the alternative, he acted outside the scope of the agency relationship?*

¶21 Appellants argue that Pinsker was not MAE's agent since MAE owned the car, employed the White Law Firm, did not contract or appoint Pinsker to act as agent, and lacked the requisite consent to make Pinsker an agent of MAE.

¶22 In the alternative, if Pinsker is deemed to be an agent, appellants argue he acted outside the scope of the agency relationship thereby subjecting himself to personal liability for his intentional tortuous conduct. Appellants urge the Court to adopt the holding in *Matagolai v. Pangelinan*, 3 CR 591, 601 (D.N.M.I. App. Div. 1988), which states that while agents are vested with general discretion to act on behalf of the principal, an agent may not act in a manner that the principal could not be presumed to have intended, or that would defeat and not promote the apparent purpose for which the agency relationship was created.

¶23 ■ We find that Lewis, MAE's employee who was present at the time the incident occurred, was the "most culpable" of all actors in this comedy of horrors. It was Lewis who knew of the intended gift of the car to Angie, yet stood by idly while Pinsker threatened to "haul Angie to jail" and insisted upon her immediate arrest. Lewis acted in concert with Pinsker when he went to the White Law Firm, told Pinsker the car had been located, and drove to Angie's work to repossess the "stolen" car.

¶24 In addition, by bringing suit based upon Pinsker's demand for the return of the car, MAE also affirmed his actions. It is conceded by both parties that no request for the return of the car was made prior to the incident of July 1, 1991. Yet, MAE based its counterclaim on the fact that due demand was made upon Angie for the return of the car, and that she refused. Since the only demand was by Pinsker on the day of the incident, MAE has affirmed Pinsker's conduct resulting in an agency relationship.

*V. Punitive Damages*

¶25 ■ Punitive damages are awarded to punish the wrongdoer and to discourage him from similar future conduct. *Santos*, 4 N.M.I. at 168. The Court shall look ". . . only to see if the record gives rise to an inference of outrageous conduct" in affirming an award for punitive damages. *Id.* at 169.

¶26 ■ It was clear that MAE misled both their lawyers and the police in order to intimidate and humiliate Angie, the wife of a business associate with whom MAE had a grievance. It was clear that Pinsker's conduct was outrageous and the jury properly assessed punitive damages, both as a punishment and as a deterrent, against MAE.

**CONCLUSION**

¶27 Based upon the reasons set forth in this opinion, we hereby **AFFIRM** the judgment of the Superior Court.